YATES, Presiding Judge,
dissenting.
Because I believe that the majority has impermissibly reweighed the evidence on appeal, I must respectfully dissent.
Reynolds was employed by Wal-Mart as a stock person; she was unloading a microwave oven from a supply truck when she suffered an on-the-job accident. She described the accident as follows: “[I] had picked [a microwave] up, and when I went to pull it off the roller, it was extremely heavy on the right side, and when I pulled it off, ... it jerked me to the floor.” Reynolds stated that she experienced a sudden pain in her neck, shoulder, arm, and hand on the right side. She testified that she had never previously been treated for injuries or other problems to these parts of her body.
Reynolds was seen by Dr. James Holder on January 21, 1998, complaining of neck, back, and arm pain on the right side. Dr. Holder concluded that Reynolds most likely was suffering from a muscle strain with inflammation, but he could not rule out a cervical-disc injury at that point. Dr. Holder prescribed antiinflammatory medication, muscle relaxers, heat, and bed rest for five days. Reynolds’s symptoms did not improve, so Dr. Holder ordered that an MRI be performed. The results of the MRI were normal, and he referred Reynolds to Dr. Duane Tippets, an orthopedic surgeon.
Reynolds was first seen by Dr. Tippets on March 4, 1998, complaining of continued pain in her neck and shoulder. She stated that the pain is worse when she stands, lifts, and coughs or sneezes. Upon examination, Dr. Tippets noted that Reynolds was tender over her cervical spine and trapezius muscle with increased pain upon compression of those areas. Dr. Tippets further noted that Reynolds had some limitation in the range of motion of her neck. He reviewed Reynolds’s MRI and noted that she most likely had a small herniation of the C4-C5 disc, which “did disrupt CSF [cerebral spinal fluid] flow and did touch the gray matter.” Dr. Tippets also noted that Reynolds had a bulge at the C5-C6 disc. He attributed Reynolds’s symptoms to the small disc herniation. Dr. Tippets prescribed medication and returned Reynolds to work at light duty with a lifting restriction of five pounds and no prolonged standing or walking.
Reynolds returned to Dr. Tippets on April 9, 1998. She stated that on a scale of 1 to 10, her pain was a 10. Dr. Tippets noted that Reynolds had gained 15 pounds; that she was having headaches, tingling in her hands, and dizziness; and that she was depressed and having trouble sleeping. An examination revealed that Reynolds was “very tender” over her neck and shoulder. Dr. Tippets took Reynolds off work completely, continued her on medication, and recommended that she be sent to a “work-hardening” program, a physical-therapy program that stimulates work activities. Reynolds was referred to Dr. Charles Clark, a neurosurgeon.
*1261 Reynolds was seen by Dr. Clark on May 6, 1998, complaining of neck pain that extended into her arm and hand. Dr. Clark noted that Reynolds had good range of motion in her shoulders, but that hyperex-tension of the right shoulder produced pain. A motor exam revealed some weakness in the right triceps. Dr. Clark ordered a myelogram and a CT scan of Reynolds’s cervical region. The myelo-gram and CT scan indicated that Reynolds had a small midline bulge at the C6-C7 level and no herniation at the C4-C5 level. Dr. Clark recommended that Reynolds undergo some rehabilitation to strengthen her upper body and to increase the range of motion of her shoulder to be followed by a work-hardening program and a functional-capacity evaluation.
Reynolds was referred to Dr. Marilyn Burson on June 24, 1998, for an evaluation and for nerve-conduction studies. Reynolds complained of increased pain through her neck and shoulder following the work-hardening program. She also stated that she had some numbness in the last three fingers on her hand and that her right arm felt weaker. The nerve-conduction studies of the right upper extremity and cervical region were normal, showing no indication of a nerve impingement.
Reynolds underwent a functional-capacities evaluation in June 1998, which was conducted by Dr. Roland Rivard. At the time of the evaluation, Reynolds complained of constant pain in her neck and right shoulder that radiated down her right hand and increased with activity. Reynolds informed Dr. Rivard that she is no longer able to do yard work or housework; that she frequently wakes up during the night because of the pain; that she is much more irritable now than she was before the accident; and that she cries a lot because she is frustrated. Following the evaluation, Dr. Rivard assigned Reynolds a medical impairment rating of 5% to the whole person. Dr. Rivard placed no limitations on Reynolds for standing, walking, sitting, climbing, balancing, stooping, kneeling, or squatting. He did restrict Reynolds to a maximum lift of 38 pounds and a maximum frequent lift of 21 pounds. Dr. Rivard also restricted Reynolds to carrying loads of 30 to 35 pounds occasionally for short distances, and loads of 15 to 20 pounds frequently for short distances. He further restricted Reynolds to only occasional reaching and handling using her right upper extremity. Finally, Dr. Ri-vard noted that Reynolds was not exaggerating her symptoms.
Following her functional-capacities evaluation, Reynolds returned to Dr. Tippets on September 18, 1998. Reynolds complained of pain in her neck and upper back and of headaches. Dr. Tippets agreed with the 5% medical impairment rating and the restrictions assigned by Dr. Ri-vard. Dr. Tippets determined that Reynolds had reached maximum medical improvement at that time.
Reynolds returned to Dr. Tippets on October 15, 1998, with continued complaints of headaches and pain in her neck and complaints of pain in her shoulder. Dr. Tippets noted that Reynolds was depressed; that she was sleeping only four hours per night; that she was not eating well; and that she had lost her “zest for life.” He further noted that Reynolds could not work or function in the condition she was in, and he recommended that she seek psychiatric treatment. Dr. Tippets referred Reynolds to Dr. Anthony Esposi-to, a neurologist, for evaluation of her headaches.
Reynolds was seen by Dr. Esposito on January 8, 1999. A physical examination revealed cervical paraspinal tenderness over the trapezius and intrascapular region on the right side. Dr. Esposito concluded *1262 that Reynolds had significant cervical paraspinal spasms and headaches, that her symptoms were suggestive of tension-type headaches, and that significant depression could be contributing to her problem. Thereafter, Reynolds was referred to a psychiatrist, who diagnosed her with depression and prescribed an antidepressant medication.
Reynolds returned to Dr. Esposito on January 28, 1999, with continued complaints of pain in her neck and right arm. She stated that she was experiencing a shooting pain from her neck into her right arm with tingling in her fingers. Dr. Es-posito ordered an MRI and nerve-conduction studies. The MRI revealed the absence of the normal cervical lordosis with minimal disc bulges at the C5-C7 levels. The nerve conduction studies were normal. Reynolds returned to Dr. Esposito on May 10, 1999, with continued complaints of pain in her neck, shoulder, and numbness in her right hand. A physical examination indicated that Reynolds had tenderness in her cervical region. Dr. Esposito concluded that Reynolds had chronic neck pain and referred her to Dr. Daniel Harrison for management of her pain.
Reynolds was first seen by Dr. Harrison on May 18, 1999. At that time Reynolds complained of headaches and neck and shoulder pain that radiated down into her right arm, which increased with activity. She stated that her pain was 6 to 9 on a scale of 1 to 10. Dr. Harrison’s physical examination indicated some limited range of motion of Reynolds’s neck with pain upon right- and left-side flexion. Dr. Harrison noted tenderness over the C5-C7 spinous processes and in the trapezius and scapular region. He further noted that Reynolds had some loss of sensation in her middle finger on the right hand. Dr. Harrison also reviewed Reynold’s previous MRI. He diagnosed Reynolds with cervical discogenic pain with bulges at the C5-C7 levels and degeneration throughout the cervical spine. He stated that he felt the bulge at the C5-C6 level was the source of her pain and that the bulge at the C7 level was the cause of the loss of sensation in her finger. Dr. Harrison testified that there are multiple causes of bulging discs and that the history of Reynolds’s accident and injury is consistent with the bulges in her cervical spine. Dr. Harrison also concluded that Reynolds suffers from somatic referred pain. He stated that somatic referred pain occurs when a bulging disc, though not impinging a nerve, irritates the nerve causing pain in areas of the body that are enervated by the irritated nerve.
Dr. Harrison treated Reynolds with epidural steroid injections. He stated that the injections helped to give Reynolds some temporary relief from her pain, although she never got complete relief. Dr. Harrison also testified that Reynolds suffers from depression, which he says is common in patients suffering from chronic pain. He referred Reynolds to Dr. H. Evan Zeiger, a neurosurgeon.
Reynolds was first seen by Dr. Zeiger on June 24, 1999. Reynolds informed Dr. Zeiger that she has been in constant pain, which ranges from light to heavy, in her neck, right shoulder, right arm, and the right side of the back of her head since her workplace accident at Wal-Mart. Dr. Zeiger reviewed Reynolds’s previous MRI and noted that it revealed minor disc protrusions and bulges at the C5-C7 levels, with an absence of the normal cervical lordosis. Dr. Zeiger ordered a myelogram and a CT scan. The tests revealed some mild bulges but was otherwise normal.
Reynolds returned to work at Wal-Mart as an exit greeter. Reynolds testified that she has constant pain in her neck and that she still experiences pain in her right arm, right shoulder, and hand. She testified *1263 that lifting, jarring, and repetitive use of her arm and shoulder and prolonged standing exacerbates the pain. Reynolds stated that she is no longer able to perform the duties of a stock person; to play ball with her children; to ride a bicycle; and to cut grass. She testified that she has suffered from depression since the workplace accident and is on antidepressant medication.
The trial court applied § 25 — 5—57(a) (3)i., Ala.Code 1975, in determining the extent of Reynolds’s impairment. Neither party disputes the application of § 25-5-57(a)(3)i. to this case. Section 25-5-57(a)(3)i. provides:
“Return to Work. If, on or after the date of maximum medical improvement, except for scheduled injuries as provided in Section 25 — 5—57(a)(3), an injured worker returns to work at a wage equal to or greater than the worker’s pre-injury wage, the worker’s permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability.”
Wal-Mart argues that the trial court erred in finding that Reynolds had a 80% physical impairment, because, it says, the physical impairment assigned by the trial court must have some rational relationship, as a matter of law, to the 5% medical impairment assigned by the medical experts in this case. Nothing in § 25 — 5—57(a)(3)i. indicates that the physical impairment rating assigned the employee must bear a rational relationship to the medical impairment rating assigned by the medical expert, and Wal-Mart cites no persuasive authority in support of this contention. This court has construed § 25-5-57(a)(3)i., in a similar case, stating:
“It is well settled that the trial court has the duty to determine the extent of disability and is not bound by expert testimony in making that determination; yet, in making its determination, the trial court must consider all the evidence, including its own observations, and it must interpret the evidence to its own best judgment. Specifically, a trial court is not bound to accept a physician’s assigned impairment rating and is free to make its own determination as to an employee’s impairment.
“The trial court is prohibited from considering vocational disability evidence under § 25 — 5—57(a)(3)i. Further, this section mandates that an employee’s permanent partial disability rating shall be equal to the employee’s physical impairment. Nothing in § 25 — 5—57(a)(3)i. can be interpreted to mean that the trial court is bound by the physician’s assigned physical impairment rating and prohibited from considering its own observations with regard to the impairment and then making adjustments to that rating, so long as it does not consider evidence of vocational disability and the disability rating assigned the employee is equal to the physical impairment rating.”
Compass Bank v. Glidewell, 685 So.2d 739, 741 (Ala.Civ.App.1996) (citations omitted). See also Fuller v. BAMSI, Inc., 689 So.2d 128 (Ala.Civ.App.1996). By arguing that the physical impairment rating assigned by the trial court should bear some rational relationship to the medical impairment assigned by the trial court, Wal-Mart is in essence asking this court to bind the trial court, at least to an extent, to the testimony of medical experts and, further, to limit the trial court’s authority to consider the evidence presented, including its own observations, in making its determination as to the extent of disability. To do so flies in the face of well-established workers’ compensation law in this state.
*1264 The evidence indicates that since Reynolds’s accident at Wal-Mart she has consistently complained of pain in her neck, right shoulder, and right arm, which would become exacerbated with activity. She stated that she had had no prior injuries or problems to these parts of her body. Physical examinations by her various treating physicians revealed tenderness in the areas of the neck and shoulder. Diagnostic testing has revealed the presence of bulging discs in her cervical spine and Dr. Tippets stated that an MRI indicated the presence of a small disc herniation at the C4-C5 level. Dr. Harrison noted that the history of the workplace accident related to him by Reynolds is consistent with the finding of the bulging discs in her cervical spine and that the bulge at the C5-C6 level was the source of her pain. Restrictions as to lifting, carrying, reaching, handling, and fingering with the right arm were placed on Reynolds after her functional-capacities evaluation. The functional-capacities evaluation indicated that Reynolds was not exaggerating her symptoms. Dr. Tippets noted that after the workplace accident Reynolds was having trouble sleeping and that she had lost her “zest for life.” Reynolds had never before been treated for depression; however, after the accident she was diagnosed with depression and placed on antidepressant medication. Finally, Reynolds testified that she was in constant pain and that her everyday activities had been limited since the workplace accident.
The special concurrence focuses on the trial court’s statement in its judgment that Reynolds “had not worked since February 20, 2000, due to pain in her neck and shoulder.” Although there is evidence in the record that indicates that Reynolds missed time from work following her return because of pain in her neck and shoulder, nothing in the record supports the trial court’s conclusion that she had not worked since February 20, 2000. However, I believe that the special concurrence gives too much weight to the statement of the trial court, considering the other evidence contained in the record that supports the finding of an 80% physical impairment. Further, I cannot look beyond the fact that the trial court applied the return-to-work provision of § 25-5-57(a)(3)i., Ala.Code 1975, and expressly stated in its amended order that it did not consider evidence of vocational disability.
Because I believe that the trial court did not abuse its discretion in finding that Reynolds had suffered an 80% physical impairment and that that judgment is supported by substantial evidence, I dissent.
CRAWLEY, J., concurs.